C. E. GULLETT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVE-
NUE, RESPONDENT.

W. J. GULLETT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVE-
NUE, RESPONDENT.

Docket Nos. 52517, 52518. Promulgated January 16, 1935.

*Hugh N. Smith, C. P. A.*, for the petitioners.
*E. A. Tonjes, Esq.*, for the respondent.

OPINION.

GOODRICH: Respondent determined deficiencies in income tax for
1928 against C. E. Gullett in the amount of $3,901.30, and against
W. J. Gullett in the amount of $3,550.01. In these proceedings
which, upon motion, were consolidated, petitioners seek redetermina-
tions of those deficiencies. There is but one issue, common to both
cases, for our decision, namely, whether respondent erred in includ-
ing in each petitioner's income a certain amount as salary, construc-
tively, though not in fact, received.

The primary facts are not in dispute. They are presented by an
agreed statement of counsel, accompanied by certain exhibits, and
supplemented by short testimony. They need not be set out in
full for an understanding of the issue.

At the times material, petitioners were resident of Lincoln, Illi-
nois. Their records were kept, and their tax returns made, on a cash
receipts and disbursements basis. Between them they equally owned
all but two shares of the outstanding stock (75,000 shares, no par
value) of Gullett & Sons, Inc. (hereinafter called the company)
They were officers and directors of the company, which was engaged
in the wholesale and retail floral business.

The company kept its accounts and made its returns on an accrual
basis, using a fiscal year ending August 31. It was organized on
September 1, 1927, and (we infer as to the nature of the transaction)
in exchange for its stock, took over from petitioners a plant and
equipment of substantial value, and bonds of a par value of
$162,038.04. It assumed various liabilities, including notes pay-
able of $118,363.54, and accounts payable of $32,148.01.

On August 31 and December 31, 1928, the investment account
(bonds) remained practically the same as at the inception of the

company. Notes payable were $114,075.40 on the first date, and $96,532.96 on the latter; accounts payable at these dates were $85,371.23 (which included $43,051.90 officers' salaries unpaid) and $10,631.05, respectively.

At the first meeting of the directors of the company salaries of $25,000 a year, payable monthly, were voted to each of these petitioners. However, at a subsequent meeting of the board on February 20, 1928, for the recited reason that the company was heavily involved, it was provided " that for the year 1928, and until such further time as the company's finances are in better shape " petitioners " shall not be allowed to draw in excess of $6,000.00 in cash."

These minutes were drawn by the company's auditors. Through inadvertence they were not signed by the directors.

Of the company's notes payable those amounting to about $66,000 were held by two banks. Bonds owned by the company to a face value in excess of the notes (the record does not disclose the exact amount) were deposited as collateral security. The bonds could not have been sold for full par value on the market; in 1928 perhaps $10,000 less than par value would have been realized upon sale. During the fiscal year ended August 31, 1929, the company distributed the bonds to its stockholders, reducing its outstanding stock accordingly.

In 1928 the company was constructing a new heating plant at a cost of about $70,000. To help finance this expenditure petitioners advanced to it during the year a total of $45,768.19, none of which was repaid.

During 1928, each petitioner drew $6,000 in cash as salary from the company, and each reported that amount in his return. The company, however, credited to each of their accounts the full salary originally voted and on its returns claimed as a deduction the whole amount so accrued. The amounts so accrued but undrawn by petitioners have never been paid to them. The company, at the time of this trial, was in the hands of receivers.

Respondent has now added to the 1928 income of each petitioner the difference between the amount drawn and reported by him, and the amount accrued and reported by the company. From those increases in the incomes of the individuals, arise the deficiencies here in controversy. Whether respondent's action is proper is the sole issue in these cases.

Respondent bottoms his action upon authority of article 332, Regulations 74, which provides, upon a theory of constructive receipt, for the inclusion in income of a taxpayer whose return is made on a cash receipts and disbursements basis, amounts credited to his account or set aside for him, even though not actually received by him,

if the funds are available to him without substantial restriction as to payment, and time of receipt thereof depends upon his own desire or judgment.

From the decisions in cases previously arising upon this issue, a number of which are cited by each party, the principles to be applied in deciding the case at bar upon its own facts have been established. It is clear that the doctrine of constructive receipt is to be sparingly used; that amounts due from a corporation but unpaid, are not to be included in the income of an individual reporting his income on a cash receipts basis unless it appears that the money was available to him, that the corporation was able and ready to pay him, that his right to receive was not restricted, and that his failure to receive resulted from exercise of his own choice. *A. L. Englander*, 1 B. T. A. 760; *John A. Brander*, 3 B. T. A. 231; *Adolph Schlett*, 7 B. T. A. 150; *W. B. Brooks*, 12 B. T. A. 31; *Ella C. Loose, Executrix*, 15 B. T. A. 169; *Albert J. Sullivan*, 16 B. T. A. 1347; *R. V. Board*, 18 B. T. A. 650; *Old Colony Trust Co. et al., Administrators*, 22 B. T. A. 1062; *Eakins* v. *United States*, 36 Fed. (2d) 961; *Moran* v. *Commissioner*, 67 Fed. (2d) 601, affirming 26 B. T. A. 1154.

Here, petitioners' right to receive their salaries in full was restricted by action of the directors of the company. They could be paid only $6,000 each until that restriction was removed when " the company's finances are in better shape." True enough, as respondent points out, these petitioners were in control of the company, both as stockholders and directors and, had they so desired, could have voted the removal of the restriction and authorized full payment of the salaries. But that they did not do. The facts are that the restriction stood, and that petitioners each received only $6,000 during the year.

Moreover, it appears that the company's financial condition was such that the full salaries, even had payment been unrestricted, could not have been paid without embarrassment to the corporation and impairment of its credit standing. Substantial liabilities were outstanding against it; part of its bonds were pledged as collateral on its debts; it did not have available the funds with which to pay the salaries in full. Indeed, petitioners were called upon to advance a substantial amount of cash to the company that it might complete an addition to its plant—advances which were never repaid.

Under such circumstances, we cannot say that petitioners, through their own choice, failed to receive the unpaid balances of their salaries, or that those amounts were constructively received by them. Cf. *Brooklyn Radio Service Corporation*, 31 B. T. A. 269.

Reviewed by the Board.

*Judgment will be entered for the petitioners.*